NORTHEAST MISSOURI ELECTRIC
POWER COOPERATIVE,
Respondent,

v.

William M. FULKERSON and Frances
Fulkerson, Appellants.

No. KCD 27158.

Missouri Court of Appeals,
Kansas City District.

Aug. 2, 1976.

Motion for Rehearing and/or Transfer
Denied Sept. 15, 1976.

Application to Transfer Denied
Nov. 8, 1976.

to make a plan for his land. Winholz was engaged in making a comprehensive plan and guide for future development for the City of Kirksville at the time. In October of 1967 Fulkerson received from Winholz a plan for the development of Fulkerson's property by the creation of a residential subdivision. Fulkerson showed the property to his bankers concerning possible financing and Fulkerson contacted various ones in the construction business with reference to the costs of developing the property. He ceased this activity in the summer of 1968. It was in June of 1968 that he first heard of the proposed condemnation.

Through the testimony of Winholz and others, defendants elicited that there was a need for a residential subdivision in the general area of defendants' property. Defendants' evidence established that the highest and best use of defendants' land as of the time of the taking of the easement was for the development of a residential subdivision. Winholz testified that the demand was sufficiently intense to make the development economically feasible.

One Neudecker, a real estate broker and developer, testified for defendants as to the factors a land developer considers in determining whether one wants to buy a particular tract, including the wishes of the client, development costs, probability of financing, and the income that could be expected. One Gibson, in the construction and land development business, also testified for the defendants as to the considerations in buying land for development. Gibson also testified as to the evaluation process he uses in determining the value of a particular tract, including the prices other lots are selling for, the cost of site grading, water and sewer, and the cost of streets.

Gibson placed a fair market value of $375,000 on defendants' property as of the date of taking, assuming there was no easement, and placed the value at $200,000 with the easement on it. He further testified as to just how he would have developed defendant's property as a subdivision if it had no easement.

Melvin L. Kodas Professional Corp. by David Q. Reed, Kansas City, for appellants.

Vance R. Frick, Kirksville, Rendlen, Rendlen & Ahrens by Branham Rendlen, Hannibal, for respondent.

Before SHANGLER, P. J., and HANNA, O'LEARY, and SMITH, Special Judges.

LAURENCE R. SMITH, Special Judge.

Defendant landowners appeal, in this condemnation case, from a judgment, following jury verdict for $6,000.

Plaintiff condemned an electrical transmission line easement diagonally through defendants' 217 acre tract south of Kirksville, Missouri. The easement covered about 12 acres. The time of taking was April 24, 1969.

Defendant William Fulkerson, hereinafter known as Fulkerson, is in the real estate investment business. Fulkerson purchased the property in 1953 for investment purposes. In 1965 he asked one Winholz, who was in private city planning practice,

Defendants offered no other evidence as to the value of the land before and after the taking. They offered no evidence in chief as to the sale of comparable tracts. However, as rebuttal evidence, defendants brought out that certain land near defendants' property was sold for residential development at $1,000 an acre and that in the opinion of the buyer, defendants' land was more valuable.

On behalf of plaintiff six different experts testified as to the value of defendants' property before and after the taking. Their opinions were based upon comparable sales in the area and the range as to defendants' loss was from $2787 to $3500. Plaintiff's evidence tended to show that the highest and best use of defendants' land was for residential use, small acreage home sites, but not for subdivision development. Two of plaintiff's experts who have experience as developers conceded on cross-examination, in determining whether one would buy property for subdivision development, one would want to add to the cost of the tract the cost of developing the property, and to estimate the prices for which lots could be sold and the profit that could be realized.

Defendants rely on four points on this appeal.

1. Exclusion of evidence concerning costs of development and anticipated profits.

The trial court denied defendants' offer of proof, through Fulkerson and Gibson, as to the cost of developing lots on defendants' tract, the anticipated sales price of lots, and as to a profit of 15 to 20% being anticipated.

Defendants contend that they were thus prevented from demonstrating factually to the jury that development of the tract as a residential subdivision was economically feasible; that these computations should have been admitted in order to throw light on the fair market value of the tract because professional developers would take such computations into account in forming a judgment as to the fair market value of the tract and in determining whether they

would buy the tract; that they are not seeking to recover projected developer's profits as a part of their damages, but what they could have realized in the sale of the land as raw land to a developer; that "the developer's method of evaluating the land" was superior to the comparable sales method because there were no other tracts in the neighborhood whose highest and best use is the same as that of the subject tract.

To support their contention, defendants principally rely on the following statement from *Greystone Heights Redev. Corp. v. Nicholas Inv. Co.*, 500 S.W.2d 292 (Mo.App. 1973), l. c. 299:

"The rule in condemnation cases is that all evidence should be permitted which is of a nature which an ordinarily prudent man would take into account before forming a judgment as to the market value of property he contemplates purchasing. As stated in *State ex rel. Highway Comm. v. Barron*, 400 S.W.2d 33 (Mo.1966):

" '[T]he tendency is to admit any evidence which sheds light on the question, leaving it to the discretion of the trial court to keep it within bounds. Artificial rules of evidence which exclude from the jury matters which men consider in their everyday affairs hinder, rather than help, the arrival at a just result.' "

The above statement was made by this court in holding that there was no abuse in the trial court's discretion in allowing the landowner to introduce into evidence a resolution adopted by a city council urging the State Highway Commission to locate an additional interchange for an interstate highway near the landowner's property.

The three normal methods for arriving at fair market value have been recognized as comparable sales, cost of replacement, and capitalization of income. *State ex rel. State Highway Commission v. Southern Development Co.*, 509 S.W.2d 18, 27 (Mo.1974). The latter two methods are not appropriate in the instant case, as they were not in *Southern Development, supra.* The cost of replacement method is not ap-

propriate because the land was not improved and the capitalization of income method is not appropriate because the land was not improved and all of the land was not taken.

In *Southern Development Co.* the trial court allowed an expert witness for the defendant to use a "cost of development" approach rather than comparable sales. The Supreme Court ruled that such method was improper because the evidence demonstrated that the use for which the tract in question was adapted was not unique and that there was no reason why the property could not be valued on the basis of comparable sales.

Distinguished, in *Southern Development Co.*, were other cases where the property taken had no market value in the ordinary sense, and it was appropriate under the circumstances to adopt a unique and different approach for the purpose of determining the fair market value of the property taken. One case so distinguished was *City of St. Louis v. Union Quarry & Construction Co.*, 394 S.W.2d 300 (Mo.1965).

*City of St. Louis, supra,* involved the condemnation for park purposes of an abandoned rock quarry being used by its owners as a private dumping grounds, grossing $20,000 annually. The quarry was only partially filled as of the date of taking. There were no other unfilled quarries or holes in the area and there had been no sale of quarries in recent years. In this unique situation, where the land was devoted to the only apparent use to which it could be advantageously and profitably applied, and where the profits derived from its use were the chief source of its value, evidence of such profits was held to be properly admitted and was considered relevant as a criterion of the value of the property.

■ The Supreme Court in *City of St. Louis, supra,* specifically stated that the announcement in that case "is not in derogation or repudiation of the general rule" as announced many times, "that business profits are ordinarily not admissible evidence of the value of the land on which the business is located." (l. c. 306)

■ As was stated in *State ex rel. Kansas City Power and Light Co. v. Salmark Home Builders, Inc.*, 375 S.W.2d 92 (Mo. 1964), cited by both plaintiff and defendants, l. c. 98:

"Damages which are sought on the theory of injury to the remainder of land after the taking of a part must be direct and certain at the time of the appropriation and, conversely, not remote or speculative; and loss of profits is usually regarded as too speculative and remote to be considered as a basis for ascertaining the damages in a condemnation proceeding."

■ From the evidence in the instant case it appears that "comparable sales" was a proper and sufficient method for arriving at the fair market value of the land in question before and after the taking.

There was received into evidence (Plaintiff's exhibit 2) at the trial, by stipulation and agreement, a list of sales of other property, giving their acreages, dates of sale and prices. Defendants made no objection to their use for the reason that they were not comparables. Various expert witnesses for the plaintiff used such sales and other sales in arriving at their opinions. In rebuttal, defendants introduced testimony of a Mr. Kearse as to the later sale at $1,000 an acre of land less than a mile from defendants' tract that had been referred to in plaintiff's evidence.

Although defendants contend that no other properties referred to in evidence were as desirable as defendants' property for development of a subdivision, it cannot be said there was not comparable property in the general area suitable for residential subdivision that had been sold. Defendants' property had a market value in the ordinary sense, and there was no necessity for adopting a unique or different approach for the purpose of determining fair market value. Although defendants were not allowed to demonstrate to the jury the economic feasibility of developing the tract in question as a residential subdivision by showing what profits might be made, this

economic feasibility was in effect brought home to the jury by the testimony of defendants' expert witnesses that in their opinion a substantial profit could be made, taking into account the cost of development. And the possibility of making such profits from developing the property as a residential subdivision has the effect of enhancing the value that an expert places upon the property, so that such profits are not ignored in fixing the value.

We believe there was no error in the trial court's refusal to allow the proposed testimony as to the cost of developing lots and as to the anticipated sales prices and profits.

2. Exclusion of sales contracts.

Defendants urge that the trial court erred in excluding from evidence two contracts of sale. The contracts, both duly signed, were dated November 15, 1971, and were from defendants as sellers to Neudecker and another as buyers. Defendants sought to admit the contracts through witness Neudecker. One of the contracts (Defendants' exhibit 7) pertained to 25 acres of defendants' land subject to this condemnation, for a purchase price of $50,000 payable at the time of closing of the sale. One paragraph of the contract provides:

"It is mutually agreed that this Contract of Sale is subject to Buyers' acquiring financing to buy this tract of land and develop same and Buyers' agree to make every conscientious effort to acquire financing for houses and/or commercial development but should they be unable to acquire financing within six months from the date of this contract, this contract shall be null and void."

The other contract (Defendants' exhibit 8) pertained to 50 acres of defendants' land subject to this condemnation (but different acreage than that covered in Defendants' exhibit 7), for a purchase price of $50,000 payable at the time of closing of the sale. It contained a paragraph three like that quoted, *supra*, (Defendants' exhibit 7), except the period of obtaining the financing was set at one year rather than six months.

The defendants offered to prove through Neudecker that Neudecker attempted to obtain financing through a particular lender with whom he had done business for a number of years, but that the lender turned him down because of the power line (the subject of this condemnation).

The trial court excluded the two contracts for the reason that the conditions in the contracts requiring financing for development as well as for the purchase leads to gross speculation as to what it would cost to develop.

Defendants rely principally on *State ex rel. State Highway Commission v. Bowling*, 414 S.W.2d 551 (Mo. banc 1967). In *Bowling*, involving a condemnation as of October 1963, the trial court excluded from evidence a contract of sale of nearby property dated April 1965, with a closing date of October 1971. Part of the purchase price was to be paid on the date of closing, and the balance evidenced by an unsecured note. During the six year interim the purchaser was to lease the property at an agreed monthly rental.

The Supreme Court en banc affirmed the ruling of the trial court for the reason that it would inject speculation and conjecture into the case for the jury to consider the price fixed more than six years in advance of the closing. However, in *Bowling*, in the majority opinion it was stated that the court cannot agree with the total exclusionary rule of contracts of sale in condemnation cases as reflected in *School Dist. of Clayton v. Kelsey*, 355 Mo. 478, 196 S.W.2d 860 (Mo.1946). The court stated that:

"In the determination of the value of land reasonable men in their everyday business affairs would take into consideration, substantially to the same extent as a consummated sale of comparable property, the price provided for in a bona fide and binding contract of sale entered into by a willing purchaser and seller when the sale price reflects the present value of the land contracted to be sold." (l. c. 554)

However, in the *Bowling* case the court went on to say (l. c. 554):

"This does not mean, however, that all bona fide executory contracts for the sale of comparable land should be admitted into evidence."

█ We believe the trial court in the instant case properly excluded the two contracts in question. The provision in each contract conditioning the agreement upon financing not just to buy the tract, but to "develop same" is not a routine standard provision for an executory contract. This gets into the complex subject of the cost of developing the tract and the provision is not specific as to just what development is intended. For all practical purposes the contract amounts to no more than an option to buy. We believe that unwarranted speculation and conjecture would be injected into the case by allowing these contracts to be received into evidence.

In addition to the above there are additional factors that support exclusion of the contracts. Both the seller Fulkerson and the buyer Neudecker testified at the trial and although both would have been qualified, neither was asked his opinion as to the reasonable market value of the land in question before and after the taking. The contracts pertained to land included in this condemnation proceeding. Also, the contracts were entered into more than two years after the condemnation proceeding was instituted, and the contracts were in fact never performed.

3. Exclusion of Fulkerson's testimony as to why he abandoned his subdivision development project.

Defendants assert the trial court erred in not allowing defendant Fulkerson to testify as to why he stopped his investigation concerning the cost of developing his plan for a subdivision. Defendants offered to prove he would have testified: "Because I found out that the power line was going through."

Defendants claim this testimony should have been admitted so the jury would understand the reason for delay in development and as to why the development was in fact not accomplished.

Defendant Fulkerson was permitted to testify that he first heard of the proposed condemnation for the easement in July 1968. He also was permitted to testify that in June and August of 1968 he ceased his activity on the surveys and discussions concerning the subdivision development.

█ Assuming it was proper to allow the proffered question and answer, we don't believe there was any prejudicial error in the exclusion of the testimony.

4. The giving of the Burden of Proof instruction.

Instruction number two given by the court, being MAI 3.02 (1973 Revision) states:

"The burden is on the defendant[s] to cause you to believe that [they have] *sustained damage and the amount thereof.* In determining the amount of your verdict, you must consider only the evidence and the reasonable inferences derived from the evidence. If you do not believe certain evidence or if you are unable to form a belief as to certain evidence, then you cannot consider that evidence in arriving at the amount of your verdict." (Emphasis added)

Defendant contends that the proper instruction is to be found in MAI 35.08 (1973 Revision) which is the same as MAI 3.02, *supra,* except for the first sentence thereof which states:

"The burden is upon Defendant[s] to cause you to believe the *evidence necessary to support the amount of [their] damages.*" (Emphasis added)

Under "Notes on Use" under MAI 3.02 it is stated "The instruction shall be used in all eminent domain cases."

MAI 35.08 appears as one of the Illustrations in the 1973 pocket part of the Missouri Approved Jury Instructions. It is in variance with MAI 3.02.

█ It was proper for the trial court to give MAI 3.02, since it is the approved

instruction, rather than MAI 35.08 which is only set out as an illustration.

The judgment is affirmed.

All concur.