Carl Edward **MYERS** and Movelda Myers, Plaintiffs-Respondents,

v.

**BI–STATE DEVELOPMENT AGENCY,**
Defendant-Appellant,

and

**Norfolk and Western Railway Company,**
Defendant-Respondent.

No. 60358.

Supreme Court of Missouri,
En Banc.

June 15, 1978.

Rehearing Denied July 24, 1978.

James E. Hullverson, Stephen Ringkamp, St. Louis, Mo., for plaintiffs-respondents.

John D. Schneider, St. Louis, Mo., for defendant-appellant.

Albert E. Schoenbeck, Stephen M. Schoenbeck, St. Louis, Mo., for defendant-respondent.

ANDREW JACKSON HIGGINS, Special Judge.

Appeal on transfer by order of the Supreme Court after opinion by the Court of Appeals (Rule 83.03), from verdicts and judgments in favor of Carl Edward and Movelda Myers against Bi-State Development Agency on his claim for damages for personal injuries and her claim for damages for loss of consortium against Bi-State and Norfolk and Western Railway Company. The questions (Rule 83.09) are whether the court erred in giving plaintiffs' verdict-directing instructions against Bi-State, in ruling on plaintiffs' cross-examination of Bi-State's doctor, in exclusion of evidence relating to brakes proffered by Bi-State, in allowing plaintiffs' evidence and argument relative to use of sick leave compensation accumulated by Carl Myers, and in admission of a St. Louis ordinance relative sounding of train whistles on behalf of NW. Affirmed.

Plaintiffs' action arose from a collision December 11, 1973, at the intersection of Goodfellow Avenue and NW tracks in the City of St. Louis between a southbound Bi-State bus and an eastbound NW train. The intersection is guarded by railroad crossing signals, one located in each of the northwest and southeast quadrants. Each signal consists of circle cross-buck signs mounted atop a pole standard. One arm of each cross-buck says "RAILROAD," the other "CROSSING." Below the cross-buck on each standard are four red flasher lights, two showing to the north and two to the south. The lights flash alternately when electrically activated by a train on the track within one-fourth mile of the crossing. Below the flasher lights on the face of each standard is a square sign which says:

"STOP ON RED SIGNAL." A southbound motorist on Goodfellow approaching the crossing would be faced with the crossing signal and two of its flasher lights in the northwest quadrant to his right, and with two of the flasher lights on the crossing signal in the southeast quadrant on his left.

Prior to the collision, Bi-State's bus had been traveling south on Goodfellow and had stopped one block north of the railroad crossing. As the driver left that stop, he saw the red lights flashing on the railroad crossing signals. He began to apply his brakes when between 60 and 100 feet from the crossing. He saw the train when he was between 30 and 50 feet from the crossing and continued to slow his bus. After nearly stopping at about 10 feet from the crossing, the driver accelerated the bus to beat the train across the intersection. He failed in his attempt and the bus was struck in its right rear quarter by the train. The driver said he accelerated because his brakes did not seem to be working right and he thought he could not stop the bus in time. The brakes had been working properly prior to that time, and tests performed after the collision revealed no mechanical malfunction. As the train approached the Goodfellow crossing, it was being slowed by its regular brakes. When the bus accelerated, the engineer, upon warning from his student engineer and brakeman, set the emergency brakes which further slowed but did not stop the train. Testimony conflicted on warnings sounded by the train.

Carl Myers was thrown from his seat in the bus by the collision and received injuries to his ribs and lungs. He was off work for several months and used some 500 hours of accumulated sick leave. While at home he was cared for by his wife Movelda. The medical evidence conflicted on permanent injuries, particularly permanent partial lung dysfunction.

Plaintiffs' claims against Bi-State were submitted by Instructions 3 and 4, identical except for names:

"Your verdict must be for plaintiff Carl Myers against defendant Bi-State Development Agency if you believe:

"First,
defendant Bi-State Development Agency either: failed to keep a careful lookout, or violated the railroad crossing signals, and

"Second,
defendant Bi-State Development Agency's conduct, in any one or more of the respects submitted in paragraph First, was negligent, and

"Third,
such negligence directly caused or directly contributed to cause damage to plaintiff Carl Myers.

"The term negligence as used in this instruction means the failure to use that degree of care that a very careful and prudent person would use under the same or similar circumstances.

"M.A.I. 17.02 modified; 11.02. Offered by Plaintiffs."

The jury's verdicts were against plaintiffs and in favor of NW; and for plaintiffs and against Bi-State for $62,500 for Carl Myers and $5,000 for Movelda Myers. Judgments were entered accordingly.

Appellant charges the court erred (I) in giving plaintiffs' verdict-directing instructions against Bi-State "because this Not-in-MAI instruction improperly creates a duty contrary to law in an argumentative and inflammatory form inferring that failure to heed a [the] warning was a punishable and inherently illegal act giving a privately erected warning device the appearance of the force of law." Appellant argues that the instructions submitted an issue which does not exist under the law because such signals do not carry the force of law, were not established by the State or its political subdivision, and that there is no statute or ordinance which makes it a crime or offense to pass through such a privately erected warning device. Appellant suggests that plaintiffs' claims would have been properly submitted on failure to stop after danger of collision was apparent in form MAI 17.04.

The difficulty in this contention is that plaintiffs' submissions against Bi-State conform to Missouri's scheme for the instruction of juries under Rule 70.

The evidence may have warranted other submissions; however, plaintiffs were entitled to submit their claims as they saw fit within limitations imposed by the evidence. Instructions 3 and 4, supported by evidence, are MAI 17.02, mandated for submission of multiple negligent acts, and they include as one of two negligent acts "violated the railroad crossing signals" as authorized by and in the language of MAI 17.01, for submission of "violated the traffic signal," together with the requisite definition of "negligence" of MAI 11.02. Nothing in MAI limits use of MAI 17.01 to situations involving "statutory" traffic controls. A "traffic signal" is an electrically operated signal such as a system of colored lights for warning and controlling traffic. *Brittain v. Clark*, 462 S.W.2d 153, 156 (Mo.App.1970). See also *Silvey v. Missouri Pacific Railroad Co.*, 445 S.W.2d 354 (Mo.1969), for approval of submission of plaintiff's contributory negligence in a truck and train crossing collision by use of "failed to heed the electric flasher warning signals." Note that among meanings ascribed to "violate," Webster's Third New International Dictionary defines the term as "to fail to keep: BREAK, DISREGARD"; and that one can "violate the standard of ordinary care," *Miller v. F. W. Woolworth Co.*, 328 S.W.2d 684, 689 (Mo. banc 1959).

Instructions 3 and 4 did not equate "violated the railroad crossing signals" with "violated the law." They instructed the jury that if it believed that Bi-State "violated the railroad crossing signals," i. e., that Bi-State failed to heed or disregarded such signals, and that such was negligence as defined, and, if so, that such negligence caused damage to plaintiffs, then the jury was to find for plaintiffs.

Nor did Instructions 3 and 4 submit negligence *per se.* See MAI 17.17 and 17.18 for submissions of *per se* negligence; and note again that paragraph Second of Instructions 3 and 4 required a finding that "violated the railroad crossing signals" was negligence before the jury could return verdicts for plaintiffs.

Appellant charges the court erred (II) in failing to sustain objection to a cross-examination question put to Bi-State's doctor relative a pulmonary function test of Carl Myers "because that question assumed a fact not in evidence and thereby denied [Bi-State] a fair trial on the issue of whether the plaintiff had a permanent loss of lung function."

Dr. A. J. Steiner had treated Carl Myers and his family for a number of years. In his opinion, Mr. Myers had lost 35% of the use of his right lung as a result of injuries received in the Bi-State and NW collision. Part of the basis for his conclusion was two breathing tests which he performed, one in March 1974, which showed decreased ability to take air, and an exercise ability test in September 1974. Bi-State cross-examined Dr. Steiner with respect to performance of a "pulmonary function test" referred to later by Bi-State's doctor, Belmont R. Thiele, M.D. Dr. Thiele stated that the best way to measure loss of lung function was to use a pulmonary lung machine producing a graph and chart of lung capacity. In Dr. Thiele's opinion, Carl Myers had suffered no loss of use of his right lung. Dr. Thiele was cross-examined by plaintiffs; and from this background, appellant, in support of his contention, asserts "the following is the pertinent record":

"Q [By Mr. Hullverson] You knew the final test, if there is a pulmonary disorder, is to take the pulmonary tests? A Not in a case like this. Q Were you looking for lung damage, you could have known what the lung damage was in his case, you could have sent him down the street? A I could have. Q Do you know they were made by Dr. Steiner? MR. SCHNEIDER: That is not true. MR. HULLVERSON: That is what Dr. Steiner testified. MR. SCHNEIDER: That is not what he testified to. THE COURT: The ladies and gentlemen of the jury will be governed by the testimony.

"MR. SCHNEIDER: I am objecting. I want my objection on the record, and ask for a ruling of the Court in that regard. THE COURT: Overruled.

"Q [By Mr. Hullverson] Did you know Dr. Steiner had run tests on this man's lungs, in order to evaluate, by graph and chart, what kind of disfunction there was, and he found a disability, I think he said, of 30 percent of the lung? A No. Q But you did not order pulmonary function test, did you, Doctor? A That is correct. MR. HULLVERSON: That is all."

▆ The foregoing quotation from the record demonstrates that defendant did not preserve by specific objection to the trial court the point now urged for appellate review. Rule 84.13(a).

Appellant contends (III)(A) that "the error briefed in Point II * * * resulted in an excessive verdict"; and (III)(B) that the verdicts "are grossly excessive because the remaining damage evidence, excluding alleged loss of lung function, support only an initial painful injury which had healed, and therefore the verdicts are clearly disproportionate to the evidence demonstrating that the falsely assumed fact substantially determined the amount of the verdict."

▆ The failure to preserve the error charged in Point II leaves nothing for review under this contention. It may not be said that plaintiffs' damages are without support. Carl Myers experienced immediate pain on his right side when thrown about in the bus; he could not breathe or lift his head. In the hospital, he struggled to breathe and breathing caused pain. At trial in June, 1975, he was never without pain in his back, neck, and shoulders, tenderness, discomfort, and inability to breathe deeply. Such pains worsen in damp or cold weather, or when confined to one position. He experienced psychiatric problems with depression, tears, and loss of self-confidence. His immediate injuries produced shock, cyanosis, four broken ribs, and a puncture and collapse of his right lung. He sustained a pneumothorax and a hemothorax, the latter requiring removal of a quart of blood. He suffered for a time from a kidney injury. He lost 35 per cent of the use of his right lung and sustained thickening of the pleura over one third of the lung with loss of chest expansion and had bad breath sounds. His ability to fight colds had lessened; he will have pain and suffering in the future. He used sick leave benefits equaling approximately $5,000. He had hospital and doctor bills totaling $2,392. He was 36 years of age at trial with a life expectancy of 37.78 years. He could not work for three months, his energy is gone, he has problems with stairs, shortness of breath, and cannot complete normal household chores or otherwise enjoy normal life. He had none of these problems before the collision. Mrs. Myers took care of her husband while he was confined to his home, and her husband is partially permanently disabled as a result of the collision.

Appellant charges the court erred (IV) in excluding evidence sought to be developed upon cross-examination of NW's expert witness to effect that a piece of sand in the brake valve can cause a brake failure which could go undiscovered upon an inspection of the brakes. Appellant admits that if its purpose had been to prove that its bus actually had sustained a brake failure because of sand in the system just before the collision, the evidence was properly excluded as speculative in that there had been no showing of sand in the collision area or other showing to support such question. Appellant argues, however, that the evidence was proper to counter the weight of prior evidence that an inspection showed no defects in the bus brakes and to show that the bus driver was not lying when he said his brakes had failed.

▆ This contention fails under the rule that opinion testimony of an expert witness must be based on facts in evidence and may not be a guess. *Crystal Tire Co. v. Home Service Oil Co.*, 525 S.W.2d 317, 324[9] (Mo. banc 1975); *Harp v. Illinois Central Railroad Co.*, 370 S.W.2d 387, 391[1–3] (Mo.1963). See *Pollard v. General Elevator Engineering Co.*, 416 S.W.2d 90, 95[1–4] (Mo.1967); *Citizens Bank of Festus v. Missouri Natural Gas Co.*, 314 S.W.2d 709, 715–716[4] (Mo.1958). There were no facts in evidence to support a question whether sand could cause a brake failure. That the effect was to show that a brake

failure might have occurred due to sand increased the speculation and confusion surrounding the question. An expert witness may be questioned on facts not in evidence to test his qualifications, credibility, and skill, *Stafford v. Lyon*, 413 S.W.2d 495, 498–499[6–9] (Mo.1967); but such was not Bi-State's purpose.

Appellant charges the court erred (V) in allowing evidence and argument that plaintiff could be compensated for use of his accumulated sick leave at some future wage rate "because there was no evidence from which the jury could determine with reasonable certainty whether the plaintiff would ever sustain a loss, nor was there any evidence from which to calculate with reasonable certainty the future inflated wage rate."

■ This contention fails under the rule, followed except in a few situations,[1] which requires that whenever there is an allegation of error which pertains only to the issue of damages, appellant must brief a separate point demonstrating that the verdict was excessive as a result of that particular allegation of error. Rule 84.04(d); *Chambers v. Kansas City*, 446 S.W.2d 833, 840–841[12–14] (Mo.1969); *Anderson v. Bell*, 303 S.W.2d 93, 100[13] (Mo.1957). See also *Miller v. Haynes*, 454 S.W.2d 293, 296–297 (Mo.App.1970).

Appellant charges the court erred (VI) in admitting in evidence an ordinance of the City of St. Louis prohibiting "regular" sounding of a locomotive whistle "because there was no evidence that the locomotive was within the boundaries of the city as it approached the place of the occurrence when a whistle would be required." Appellant argues that the admission gave the railroad an excuse for negligence in failing to sound its whistle and deprived the jury of a chance to find that a sounding of the whistle would have caused the bus driver to apply his brakes sooner and to have stopped instead of attempting to beat the train through the crossing, with the result that the railroad was absolved of liability despite its negligence.

■ Appellant could not have been prejudiced by such an error in favor of the codefendant. Only the plaintiffs could have been prejudiced by it, and they are not complaining. A defendant may not complain of errors whose only effect was to absolve codefendants of liability and thus to prevent a joint verdict against both defendants. *Duboise v. Railway Express Agency, Inc.*, 409 S.W.2d 108, 115[5] (Mo.1966); *May v. Bradford*, 369 S.W.2d 225, 228[4] (Mo. 1963); *Ciardullo v. Terminal Railroad Ass'n of St. Louis*, 289 S.W.2d 96, 98–99[3, 4] (Mo.1956).[2]

Judgments affirmed.

MORGAN, C. J., BARDGETT, DONNELLY and RENDLEN, JJ., and HOUSER, Special Judge, concur.

SEILER, J., concurs in part and dissents in part in separate opinion filed.

FINCH, J., not sitting.

SIMEONE, J., not participating because not a member of the Court when cause was submitted.

SEILER, Judge, concurring in part and dissenting in part.

I concur except as to the ruling that the objection to the question about the pulmonary function test was not sufficiently specific, to which portion of the opinion I dissent.

1. See *State ex rel. Kansas City Public Service Co. v. Shain*, 350 Mo. 316, 165 S.W.2d 428, 432[6] (1942) (point that verdict was excessive not needed if error relates to instructions on damages); *State ex rel. State Highway Com'n v. Thurman*, 552 S.W.2d 42 (Mo.App.1977) (point not needed if only issue in case is damages). See also *State ex rel. State Highway Com'n v. Gravois Farm Club*, 483 S.W.2d 786, 789–790[8] (Mo.App.1972), refusing to require separate point on inadequacy of verdict when error only pertains to inadequacy of a damages award.

2. The instant case was tried prior to the decision of *Missouri Pacific Railroad Co. v. Whitehead & Kales Co.*, Mo. banc, 566 S.W.2d 466; and application of the rules stated in this paragraph should not be taken to affect or modify the law as declared in that decision.